IN THE UNITED STATES DITRICT COURT FOR
THE SOUTHERN DISTRICT OF ILLINOIS

CHARLES THOMAS PACLIK, )
   Plaintiff )
)
and ) No. 07-294-DRH
)
JENNY CAROLINA URQUIAGA- )
                   PACLIK )
   Defendant )

FILED

## PETITION FOR INTERVENTION

COMES NOW the Plaintiff, Charles T. Paclik, Pro Se, of 623 St. Clair Ave. Belleville, Illinois 62220 and as and for his Petition for Intervention, states as follows:

     That on or about August of 2001 the Plaintiff, a US National acting as an Associate Professor in Japan at Kansai GaiDai International University, met the Defendant, a Peruvian National, at the time currently married and separated from her estranged husband and working in a factory, and both parties agreed to date. As part of this agreement the Defendant, a Peruvian National stipulated that prior to any commencement of intimate relations the Plaintiff had to agree to attend her "church" of choice, which the Defendant agreed to do. The church turned out to be headed by a Peruvian National, husband and wife couple who just happened to be close friends of the Defendants, mother, A Peruvian National, living in Lima Peru. The Plaintiff later learned that the husband who headed the "church" was being held in Japanese prison for a visa scheme. After much discussion on the risk of pregnancy, due to the fact the Plaintiff had a son from a prior marriage and his wish to be cautious and being assured by the Defendant that she was unable to become pregnant the parties entered into a consensual intimate relationship. Within two weeks the Defendant became pregnant. After the Sept. 11th world trade center attacks and upon urging of the Defendant the Plaintiff decided to return to the United States with the now pregnant Defendant. The Plaintiff later learned that the Defendant had seen him prior to the initiation of any contact by the Defendant or relationship as they lived in close proximity, the Defendant had made a trip to the US to meet with her Peruvian National sister, whom the Plaintiff was later told by the sister directly she had entered into her marriage with a US National for the purpose of gaining a US Permanent Resident Card, the Defendant returned to Japan met with a mutual friend of the Plaintiff discussed the Plaintiff and his Nationality and situation in detail and then the Defendant proceeded to initiate contact and an intimate relationship with the Plaintiff.

1

That on or about January 2002 the Plaintiffs mother gave the Defendant an Illinois rules of the road book and offered to teach the Defendant to drive at anytime the Defendant chose and that the Defendant refused to study or even attempt to learn to drive.

That on or about February 2002, after the Plaintiff and Defendant had arrived in the US, the Defendant began starting bizarre arguments and claiming she came to the US with the Plaintiff in order to go live with her sister who resides in San Francisco, CA. The Plaintiff, despite being broken hearted by this purchased an airline ticket for the Defendant to go and live with her sister. After dropping the Defendant off at the metro link station, the Plaintiff discussed what had occurred with his parents and all agreed at that time that something just didn't feel right about the situation. The Defendant received a call from the Plaintiff approximately 2 hours after she had left and the Plaintiff stated she had had a change of heart. The Plaintiff, feeling uncertain about this situation but out of love and concern for his unborn child and the Defendant, at this point asked the Defendant if she wanted to return home. She said she did. The Plaintiff expressly asked The Defendant if her return is out of Love for the Plaintiff. The Defendant confirmed that love was her motivation for returning to the Plaintiffs home. The Plaintiff later learned that the Defendant had conversed with her sister in San Francisco, that the Defendant's sister had not yet received a Permanent Resident Card and that the defendant' sister was concerned about this due to her own situation.

That the Plaintiff became aware that the Peruvian National husband and wife "pastors" from the church that the Defendant attended suddenly began living close to Chicago and two more of her close relationships thru this "church" suddenly began living southwest of Chicago.

That on or about April 2003 the Defendant began keeping a calendar of her menstruation cycle and that on or about June 2003 the Defendant suddenly became pregnant a second time. That on or about July 2003 the Defendant suddenly announced her divorce from her estranged Peruvian husband had finalized and informed the Plaintiff that he could either "marry me and file my visa paperwork or I'm take my kids and leave and never let you see them again and you will have to pay me money." The Plaintiff having an older son from a previous marriage in the home, a now 2 year old son and another on the way, out of his love for them, decided that it was in the best interest of the minor children to have both parents in their lives no matter what so he complied. On July 23, 2003 the parties were married in St. Clair County court by a justice of the peace.

That on or about September 2003 the Defendant demanded the Plaintiff file all of her visa paperwork for her permanent resident card. The Plaintiff complied. That on or about December 2003 the Defendant began a campaign of abuse toward the Defendant, the Defendant's minor children and the family pet. Although unknown to the Defendant at the time, All in an attempt to get the Plaintiff to lose control. The abuse was of a nature of taunts, for example; you are worthless, you are stupid, something is wrong with you, you are nothing and other such remarks. The abuse was of a physical nature in that the Defendant would physically strike the Plaintiff and then attempt to taunt the Plaintiff into reciprocating, the Defendant began to strike the minor child from the Plaintiff's previous

2

marriage and use the same taunts toward the minor child as well, these attacks included using the buckle end of a belt for corporal punishment in which the Defendant caused the minor child's penis to bleed and in which incident the minor child disclosed the beating to his close friend JJ, a neighbor. That when the Plaintiff realized what this was really all about for sure and pleaded with the defendant to stop and subsequently told the Defendant he would contact law enforcement the Defendant laughed in his face and said "Who you gonna tell, no one will believe you, I am the woman. Just look at you. There is nothing you can do about it." And that the Defendant began threatening the Plaintiff that even if the Plaintiff did tell any one the Defendant would "Take the kids and leave and never let you see them again and then you have to pay me money." That when the Plaintiff informed the Defendant that he would contact Immigration and find out what his rights were again the Defendant laughed in his face and said "Go ahead, they can't do anything, you can't prove anything and they are too busy anyway." That after all of this most of the Defendants previously filed visa paperwork was returned by Immigration. That the Defendant was clearly shaken by this as the Plaintiff, by this time, was well aware of the Defendants motives in this marriage. The attempts to get the Plaintiff to be abusive toward the Defendant by the Defendant escalated dramatically.

In the escalation some of the incidents were the Defendant had the oldest minor child enter the bathroom lean across the toilet bare himself and proceeded to repeatedly strike him on his backside in excess of 23 times. The excuse given for this beating was that the minor child had lost a basketball at school. In another incident the minor child did not hear the Defendant call him while he was outside playing. The Plaintiff was outside as well and saw the Defendant exit the home and retrieve the minor child into the home. The Plaintiff entered the home approximately 15 minutes later and could hear the downstairs shower running. Upon entering the bathroom the Plaintiff discovered the minor child standing in the shower naked, only the cold water on, shower curtain open, arms crossed, hunched over, teeth chattering, crying and the minor child pleaded for the Plaintiff to turn off the shower which the Plaintiff immediately did. The minor child, upon being asked why he was in an ice cold shower, stated that the Defendant had put him in the shower as punishment.

The Defendant unclothed the couples 2 year old biological minor child in the living room in front of the Plaintiff's now 11 year old minor child and proceeded to strike the 2 year old repeatedly all over his body leaving red marks and when the Defendant noticed that the older minor child was observing the Defendant took the then 2 year old minor child into the bathroom and closed the door. The Defendant entered into a campaign to deprive the oldest minor child of toys, clothes and personal liberties in most cases justifying this by saying that, for example, you can't have anything Disney because it is satanic or you can't listen to Bon Jovi because he is a devil worshipper and other such religious mantra in order to justify bizarre behaviors of abuse. When the Defendant was directly asked by a close friend of the Plaintiffs if the Defendant were so religious why was it ok for the Defendant to enter into a sexual relationship with the Plaintiff while she was still married to another man? The comment made by the Defendant was "Oh for me it's different."

In one particular striking incident the Plaintiff had arrived home from work at approximately 7am and entered the home and could hear the biological minor children ages 1 and 3 screaming. The Plaintiff determined the screaming was coming from the

3

Defendants bedroom, as the Plaintiff was not allowed with or to sleep in the same room as the Plaintiff, and as the Plaintiff opened the door he witnessed the Defendant take the then 1 year old biological minor child by the head and slam his head into the head of the then 3 year old biological minor child. The Plaintiff immediately removed the minor children from the room of the Defendant. The Defendant would have the oldest minor child get up at 7am, while the Plaintiff was at work and unknown to the Plaintiff, have the then 8 year old minor child be responsible for taking care of the then 1 and 3 year old biological minor children until the Defendant would decide to wake up. The Defendant usually got up between the hours of 11am and 1pm. The Defendant then would make the older minor child go to his room and stay there until approximately 30 minutes to 1 hour prior to the Plaintiff arriving home from work which usually occurred at approximately 5pm.

    That as the marriage approached the 2 year mark the Defendant launched a campaign of surveillance. At the insistence of the Defendant stating safety concerns, the Plaintiff installed an inside and outside video and sound surveillance system. The defendant was adamant that a camera be in every room, especially the Plaintiffs and yet stated that no camera could go into her room stating that she needed her privacy. That unknown to the Plaintiff the Defendant began to record the phone conversations the Plaintiff made and received using a recorder owned by the Plaintiff that the Plaintiff had stored away after having used the device in college.
    That the Defendant then befriended Brenda Yaeger and Henry Goehner of 620 St. Clair Ave. neighbors who live together. Brenda Yaeger previously had lived in Henry Goehners home with her husband. In this marriage Brenda Yaeger had gotten custody of her children by having her husband jailed for supposedly having methamphetamine in the basement. The Plaintiff is unaware of the specifics.
    That as the marriage hit exactly the 2 year and 1 month mark the Defendant began contacting the violence prevention center of Belleville, IL. The Defendant then proceeded to claim that she did not feel safe at home and in or about August 2005 the Defendant began to start arbitrary curse match type arguments with the Plaintiff and then the Defendant summoned the Belleville City Police to the couples residence stating she was going to get the Plaintiff arrested and there was nothing the Plaintiff could do about it. The marriage had been in effect for 2 years and 2 months. The Plaintiff later learned that Immigration requires an Alien to be married to a US citizen for 2 years in order to be qualified to file their own Immigration Petitions. The Plaintiff further learned that the Defendant's sister has been using and Immigration Attorney that is close to the Defendants family for this entire time.

    That on September 12th, 2005 the Defendant again summoned the Belleville City Police to the home and stated that the Defendant was going to get the Plaintiff arrested and that there was nothing the Plaintiff could do about it and that while he was arrested she was going to kidnap the children and leave and there would be nothing the Plaintiff or anyone could do about it. At these times the Belleville City Police would come out listen, take a report and the Plaintiff explained to them explicitly what was actually occurring.

4

On September 12th, 2005 the Plaintiff simply could not take anymore and in desperation went to the St. Clair County Court room 305 and began filling out the necessary paperwork for an Emergency Order of Protection. As the Plaintiff was filing out the paperwork for his Order of Protection the Defendant showed up in the courtroom and with the aid of the court advocate began filing out paperwork in an attempt to counter file. The hearing was held in front of The Honorable Scott Mansfield. In this hearing the Defendant and not the Plaintiff was asked by The Honorable Scott Mansfield if the Plaintiff had ever been physically abusive toward her or the minor children to which the Defendant answered "No." The Defendant then produced the micro cassette player owned by the Plaintiff and said "But I record him, everything he say you want to her it?" To which The Honorable Judge Mansfield initially said yes. The Honorable Judge Mansfield then asked the Plaintiff if he planned on beginning divorce proceeding to which the Plaintiff answered that he thought so. The Honorable Judge Mansfield then denied the Orders of Protection saying it was a matter for family court. The Plaintiff at this time was unaware that any such recordings had been made of him. It is the contention of the Plaintiff that the Federal Wiretapping statutes have been violated by the Defendant.

On this same day the Plaintiff returned home to await his now 3 year old minor child's return from pre-k. The Defendant did not return home. At approximately 4pm the Defendant arrived at the home with 2 marked cars from The Belleville City Police and a plain marked can in which his now 1 year old was sat without a car seat. The Plaintiff was informed by the Belleville City Police that the Defendant was leaving and that she was taking the 1 and 3 year old minor children with her. The Plaintiff explained to the sergeant on duty at the time exactly what is and had been occurring, what had occurred earlier in the day at the Order of Protection Hearing, that there were no Orders of Protection or any orders issued allowing the removal of the minor children from their home, that the Defendant was a Peruvian National with no legal status and had in fact stated to the Plaintiff that she was going to kidnap the minor children and that the Defendant stated in front of the officers helping her get her things and the Plaintiff's mother at that moment "see I'm taking the kids and leaving and there's nothing you can do about it and you will pay me money." The Plaintiff informed the Sergeant that the Plaintiff felt that this was a marriage fraud and that they were in fact assisting the Defendant in accomplishing this. The Plaintiff then stated he was not going to allow the forced removal of the minor children from their home. The Plaintiff was informed by the Belleville City Police Sergeant on duty on 3 separate occasions that if the Plaintiff did not allow the Defendant to remove the children he would be arrested. During this process Brenda Yaeger and Henry Goehner approached the Plaintiff and told the Plaintiff to give the minor children to the Defendant. The Plaintiff made them aware that this is a marriage fraud scheme and requested they not get involved. The minor children were then forcibly removed from their home since birth. The Plaintiff ordered an official transcribed copy of the Order of Protection Hearing and in the transcription there is no record of the Defendants testimony to recording the Plaintiff nor is there any record of the Defendant being asked whether or not the Plaintiff had ever abused his children. The Plaintiff later questioned the Defendant about the location of the tape and tape recorder and the Plaintiff was told by the Defendant she had given it to the lady who heads the Violence Protection Center. It is the position of the Plaintiff that the civil rights of his

5

minor children were violated and that his civil rights were violated by being forced to relinquish the minor children under threat of arrest and that court documents and key testimony have been altered. It is the position of the Plaintiff that the Belleville City Police actions and all actions occurring after this time and date in the St. Clair County Court system have been rendered illegal and of no effect as the St. Clair County Court had been brought into this by the rendering a substantial issue ruling on the Order of Protection Hearing Forum and the court had been advised the Plaintiff was filing a Petition For Dissolution and the violence prevention center of Belleville assisted in this as well. It is further the contention of the Plaintiff that in an effort to correct their mistake the Violence Prevention Center of Belleville in cooperation with the court advocates and the Immigration Advocacy Center in Collinsville Illinois used and continued to use their influence to direct this case and helped facilitate the altering of court records which will be addressed below.

On September 15th, 2005 the Plaintiff was able to obtain a temporary restraining order against the Defendant and file a Petition for Dissolution, case number 05-D-814. This case was assigned to The Honorable Judge Alexis-Otis Lewis. The Defendants attorney is E. Nicole Carrion who just happens to be formerly of Land of Lincoln. In February 2006 The Plaintiff requested that a GAL be assigned to his minor children. The Plaintiff was told that if the court felt that a GAL needed to be assigned the court would assign one. No GAL was assigned. There had been 2 hearings held in front of The Honorable Judge Alexis Otis-Lewis in which no testimony by either party had been given or heard and the Defendant was given leave to remove the minor children to the State of California on a permanent basis by the Honorable Judge Alexis Otis-Lewis.

On September 16th, 2005 at 8:30pm by phone the Plaintiff said to the Defendant, Look we are apart, we will divorce can you just please be honest for once, did you ever even love me." To which the Defendant replied flatly "No" and hung up the phone.

From December 2005 to June 2006 the Defendant denied contact with the minor children and frustrated the minor children's relationship with the Plaintiff. The Plaintiff on several occasions was forced to resort to calling the Walnut Creek Police Department in California in an effort to attempt to get the Defendant to cooperate with the St. Clair County Courts orders. Walnut Creek stated they could not enforce orders written from St. Clair County, IL. and that St. Clair County had to enforce their orders. The relationship of the minor children to the Plaintiff had so deteriorated that the Plaintiff finally told the Defendant that he would use whatever legal means necessary in order to be able to communicate with his minor children. The Defendant said "You think I'm worried about that? I'm from Peru the US courts can't do anything to me. I will get what I want or I will take the kids and leave the country and there is nothing you or the court can do to stop me." The Plaintiff reminded the Defendant that doing so could result in Parental Kidnapping Charges. The Defendant said "Hah, you think they can find me? You and no one can find me if I don't want." The treats were serious and frequent enough that the Plaintiff put his US citizen minor children on The State Departments watch list. Contacted Immigration and Customs Enforcement and The Attorney Generals office all of which said that it would be extremely difficult if not impossible to have the minor

6

children returned from Peru and that all that was needed to gain Peruvian nationality for the US citizen minor children was their birth certificates.

On June 27th, 2006, June 29th, 2006, and July 12th, 2006 The 4 year old minor child disclosed that he was being sexually abused to Stacey Thoma of Call For Help during private counseling sessions and that he was being sexually molested by an associate of the Defendant while in the Defendants home and under the Defendants care. The minor child also displayed extreme fear of water but would not disclose the reason for his fear. The Plaintiff felt it was best to allow the minor child to disclose why he was terrified of water in his own time. After the June 27th, 2006 disclosure the Plaintiff was present while Stacey Thoma Hot lined a report to Illinois DCFS and the equivalent in Walnut Creek, CA. as this is currently where the Defendant resides with her sister. No investigation or interview was conducted by Illinois DCFS within the 24 hour legal requirement although the Plaintiff requested an Interview be done repeatedly. Illinois DCFS stated that since it happened in California it was California's jurisdiction. The equivalent of the California DCFS stated that since the minor children were in Illinois there was nothing they could do. The Walnut Creek Police department said the same. It is the Plaintiffs position that the denied phone contact, threats of parental kidnapping, the repeated inability of The Walnut Creek Police Department to enforce orders written by St. Clair County and the inability for the California equivalent of the Illinois DCFS to investigate clearly demonstrate diversity exists in this case.

On June 30th 2006, The Plaintiff was awarded an Emergency Order Of Protection issued by the Honorable Judge Brandon due to these fresh issues and allegations of abuse of the minor children at the hand of an associate of the Defendants and at the hand of the Defendant.

In July 2007, The minor child disclosed to the Plaintiff that he was afraid of water because "I and Ian take a bath and I pushed Ian, Ian fell down, mommy got mad, mommy pushed me under the water and I can't breath, I drown, I die, I don't want mommy push me under water lots of time. I don't want mommy be mad, I don't want drown, I don't want die."

On July, 18th, 2006 After a 7 hour hearing in front The Honorable Judge Brandon in which both the Plaintiff and the Defendant were represented by counsel the Plaintiff, stating he has video documentation of the abuse, he has the sworn statement of an independent evaluator from the Call For Help Center of Belleville documenting the disclosure of abuse on 3 separate occasions by the now 4 year old minor child and the Plaintiff having the names and numbers of two St. Elizabeth's Admitting room nurses having witnessed the 4 year olds disclosure of being abused by the Defendant by being pushed under water at bath time as punishment. Based on testimony and the evidence provided, the Plaintiff was awarded an 18 month Plenary Order of Protection in which the Plaintiff was granted sole custody of his now 2 and 4 year old children. The Defendants counsel immediately appealed the Plenary Order of Protection citing right to have the Order heard by a different Judge.

On July 19th, 2006 the Defendant was arrested and remanded for prosecution for violating the Plenary Order of Protection for attempting to forcibly remove the minor children from the Plaintiffs home of 623 St. Clair Ave. Belleville, IL. No GAL was assigned. The Plaintiff learned the identity of the occupants of a maroon van that had been parked outside and canvassing the Plaintiffs home for approximately 4 hours this day. This was prior to the Defendant attempting to forcibly break into the Plaintiffs home. The Plaintiff identified them as the two "church" friends who just happened to move and come to live in southwest Chicago around the time the Defendant and the Plaintiff moved to Belleville.

From July 19th, 2006 forward Brenda Yaeger and Henry Goehner of 620 St. Clair Ave hve begun attempting to file numerous police complaints against the Plaintiff in an effort to have him incarcerated. The Plaintiff is aware of no less than 5 specific instances to date. Brenda Yager and her sister, name unknown, finally succeeded in getting the Plaintiff cited for trespassing in a he said she said contest, 2 women against 1 man contest. It is the Plaintiffs position that any complaints by Brenda Yaeger or Henry Goehner are false and that Brenda Yaeger and Henry Goehner have harassed the Plaintiff repeatedly and that Brenda Yaeger and Henry Goehner have made several false police reports in an attempt to defame and harass the Plaintiff and have even gone as far as to bring in another friend, Nikki Clay, of 612 St. Clair Ave. to make false statements to the police.

The Plaintiff prays for relief from this court by issuing a Restraining Order against Brenda Yaeger and Henry Goehner of 620 St. Clair Ave. and Nikki Clay of 612 St. Clair Ave. Belleville IL. and that any citations, tickets, charges or convictions from the allegations made by either Henry Goehener, Brenda Yaeger, Nikki Clay or all be summarily dismissed retroactively and that this court appoint expert legal counsel, having experience in these type of cases to the Plaintiff as expeditiously as possible.

On July, 22nd 2006, While with the Plaintiff at St. Elizabeth's Hospital Emergency room due to a fever, as the Plaintiff was in the process of doing the insurance paperwork and within the sight and earshot of two separate admitting room nurses in a conversation spontaneously instigated by the minor child, the minor child again disclosed the abuse by the Defendant, by being pushed underwater at bath time, in a conversation with the Petitioner. The admitting room nurses who overheard this gave the Petitioner their names in their hand writing, their personal phone numbers and documented the date and time of this incident. One of the nurses told the Defendant that they are mandatory reporters and are obligated to report this. It is unknown to the Plaintiff if the abuse disclosure was hot lined.

On November 1st 2006, A full 5 months after the initial disclosures of recordable abuse allegations, A GAL was finally assigned to the minor children by The Honorable Judge Alexis Otis-Lewis. The GAL was assigned by the court while the Plaintiff was outside the courtroom.

8

On November 1st, 2006 The GAL met with the Defendant. The Plaintiff attempted to contact the GAL on several occasions and the GAL would not return his calls. Finally the Plaintiff left a message to the Gal stating that the Defendant had possibly violated the Plenary Order Of Protection Again and that the Plaintiff was considering filing a complaint. The GAL immediately returned the Plaintiffs call and met with the Plaintiff on September 6th 2006. The first question to the Plaintiff by the GAL was "*So what makes you think you're the better parent?*" This question was asked in an extremely sarcastic tone which the Plaintiff took as an attempt by the GAL to show him she didn't care what he had to say. The Plaintiff stated his reasons, better able to and more likely to facilitate visitation, willing to help with transportation cost, better able to provide for and care for the children as the Plaintiff had already been doing all of these things since June 2006. The Plaintiff reminded the GAL that the Defendant had from December 2005 to June 2006 Denied phone contact with the minor children. The GAL was already aware that the minor children were Three Thousand miles away from the Plaintiff. The GAL was already also aware that the Plaintiff had at his own expense given proper notice and flown all the way from St. Louis to San Francisco to exercise his court ordered visitation and that the Plaintiffs visitation had been completely denied by the Defendant. The GAL was also aware that the Plaintiff has had to contact the Walnut Creek Police Department in an attempt to try to get St. Clair County Court orders enforced and not once has the Defendant been able to do so. The GAL was also aware that even when the Plaintiff had flown to Walnut Creek, St. Clair County Order in hand that Plaintiff was not able to get St. Clair Counties Court Order enforced. On the denial of visitation incident Officer Balmy had the order personally given to him by the Plaintiff and the Plaintiff was told by Officer Balmy his hands were tied and there was nothing he could do. Officer Balmy did do an incident report. The report number is 06-8467 and told the Plaintiff that all that could be done was for the Plaintiff to return to the St. Clair County and that there is no clear jurisdiction. The Gal was also aware that in an effort to justify the denial of visitation the Defendants attorney used a letter concerning Immigration Reform and asking for help that was sent to Representative Tom Holbrook by the Plaintiff. The Defendants attorney took one sentence from the letter and used that sentence to try to make it appear that the Plaintiff intended to get his minor children from the denied court ordered visitation and not return them to the Defendant. The Defendants attorney did this knowing full well that was not the case or the meaning by the Plaintiff in that letter and that that sentence had absolutely nothing to do with the denied visitation in question. The GAL stated "*so what's this about abuse?*" Again in an extremely sarcastic tone and inflection that the Plaintiff took to mean she already did not believe him. The Plaintiff produced a video tape taken over a period of approximately a month and a half, clearly date and time stamped, in which the audio is difficult to hear simply because a lot of the disclosure by the minor child is whispered. The Gal again in very sarcastic tone and inflection asked "*Is this going to take long? I have an appointment to go to in 45 minutes.*" The Plaintiff had been with the GAL for approximately 10 minutes up to this point. After viewing the tape and hearing the 4 year old minor child clearly say "Mommy pushed me under the water." The GAL stated she had to get a forensic interview done. The Plaintiff stated "I have been trying to get someone to do that since June 2006." Two forensic interviews were conducted at the Belleville Children's Advocacy Center one on September 10th, 2006 and the other on September 13th, 2006. The Plaintiff to date has

9

never seen the tapes although they should have been entered into court evidence by the GAL.

In early December 2006 Detective Wallace, of the Walnut Creek Juvenile crimes division called and stated to the Plaintiff that he was proceeding with the investigation of the child abuse in California. This was a full 7 months after the allegations surfaced and a lifetime ago for the minor child. The Plaintiff advised Detective Wallace that two forensic interviews had been conducted in Illinois by The Belleville Advocacy center. Detective Wallace stated that "no one told me" of this and was irritated because that falls within the prevue of the GALS responsibility and he has jurisdiction in this case. Detective Wallace stated he would look into it. On December 26th 2006 Detective Wallace called the Plaintiff and stated that he had received the report from the Illinois State Police and that "Something clearly happened." On December 28th, 2006 Detective Wallace again called and stated he was proceeding with the investigation and that "There is a lot of evidence here, we have prosecuted with less." "I still need to do few interviews before I pass it to the DA's Office. On January 2nd 2006 in open court the in response to a question by the Honorable Alexis Otis-Lewis concerning the abuse of the minor child the GAL stated "I looked at Mr. Paclik's *little* home video your honor and it is painfully obvious to me the children were coached." The Plaintiff told the Honorable Alexis Otis-Lewis that he found that had to believe as the GAL immediately ordered a forensic interview. The GAL said "It was painful to watch." The Plaintiff then stated to The Honorable Alexis Otis-Lewis that the Walnut Creek Police Department, which has jurisdiction over this matter was of the opinion there was enough to proceed. The GAL got a panicked look on her face and stated "I don't know anything about that your honor." On January 9th 2007 Detective Shawn Wallace of the Walnut Creek Police Department called and informed the Plaintiff that he was proceeding with presenting the case to the DA for prosecution and that the GAL, Attorney Patty Keivlan had contacted him and attempted to have him conduct his interview of the Defendant over the phone while the Defendant was temporarily in Illinois and that he told the GAL "No way I want her here for this." It further came to the attention of the Plaintiff that the only visa the Defendant currently has is a temporary work visa which expires in July 2007.
In early February the Walnut Creek DA's office sent a letter as unable to prosecute due to lack of evidence? It is the Plaintiffs position that the GAL interfered with the investigation of the child abuse and that in so doing committed Professional Misconduct and that in open court admitted to seeing a minor child disclose abuse and did nothing to protect the minor children. The Petitioner is of the position this constitutes gross negligence.

On February 20th 2007 a hearing was held on Defendants motion to vacate The Plenary Order of Protection. The Defendant successfully argued that the lower court did not have jurisdiction to vacate the order as it was still in front of the Appellate court. The Plaintiff's counsel at this hearing suddenly wanted to withdraw from the case. The Plaintiff asked in open court and on the record to be sure if he had 21 days to find new representation and was told yes by The Honorable Alexis Otis-Lewis. To which the Plaintiff then agreed to allow counsel to withdraw.

In February 2007 the Appellate Court ruled that the Defendants motion to be heard by a different Judge was valid and stated that their ruling was on that point of law only and not on any points of the allegations contained within the order, or for the reasons it was issued, or the points of law contained within the order itself and the Plenary Order of Protection was handed down for remand and to be reheard by the lower court.

On March 1st 2007 The Plaintiff went to court on what he was led to believe was a status hearing. The Plaintiff went to court without the benefit of counsel and by recommendation of counsel that he intended to retain, was told that there was already a hearing set for the 21st and 22nd just ask for a continuance until you can retain counsel. the Judge should have no problem you have 21 days from the time your counsel withdrew to find representation. The Plaintiff has never represented himself prose in this case. Prior to anything happening the Plaintiff noticed that all the case were being called except his and the Plaintiff knew he had to call his place of employment as this was normal work day for him and it was obvious that this was going to take a lot longer than anticipated so based on that he needed to call his employer and let him know what was going on. The Plaintiff also wanted to call legal counsel one more time to attempt to have them show up. The Plaintiff exited the courtroom in order to go to the public payphone and the Honorable Alexis Otis-Lewis's clerk ran past the Plaintiff nearly knocking him over and directed the bailiffs at the end of the hall not to allow him to leave the hall. The Plaintiff explained to the clerk that he needed to use the public pay-phone and was told "You can't." The Plaintiff returned to the courtroom and saw the GAL, The Defendants Legal Counsel and the Defendant from California all in the court room and immediately realized that there was going to be a full hearing to vacate the Plenary Order of Protection. The Honorable Alexis Otis-Lewis entered the courtroom and informed the judge that the Plaintiff had requested to use the public pay phone to which the Judge said "Absolutely not." During the call of Representatives the Judge stated to the Plaintiff that he was there representing himself pro se to which the Defendant replied he was not. The Defendant reminded the Judge that his counsel had withdrawn on the 26th of February and that he had found counsel but counsel could not be at this hearing today and requested a continuance to which the Judge denied. A full hearing was held to vacate the Plenary Order of Protection to which the Plaintiff reminded the court that the minor children have been in their home sine June 2006. The status quo has been established, that the minor children get extremely stressed out if there routine changes dramatically, the minor children were receiving individualized daily instruction and that they have already been traumatized and were showing signs of developmental delay due to the trauma already suffered and that there were court dates already set for March 21st and 22nd March which was just a couple of weeks away. The Plaintiff reminded the court of the denied contact and visitation by the Defendant between the minor children and the Plaintiff. The Defendant on the other hand had 4 separate overnight long term visitations facilitated by the Plaintiff from June 2006 to March 2007 and had facilitated and arraigned liberal phone contact of the minor children with the Defendant well over what the court orders called for. The Plaintiff pointed out the Order of Protection was remanded back to the lower court to be heard and requested that it be heard now and was told by the Judge "We are not going to do that today." The Judge to this point had heard no arguments on the Order of Protection whatsoever, as the Plenary Order of Protection

hearing was held by The Honorable Judge Brandon, and yet told the Plaintiff "You used the ex parte proceeding in the order of protection venue." The Judge vacated the Plenary Order of Protection awarded the minor children back to the Defendant and refused to provide for any visitation with the minor children to the Plaintiff, the minor children's older sibling whom they have been with since birth, or the minor children's paternal grandparents.

   In addition to being denied the right to use a public phone to call his employer or legal counsel, the Plaintiff subsequently was terminated from his well paying position as a Federal Contract Employee for The United States Postal Service. The Plaintiffs employer stating unfortunately this was the last straw. The defendant to date has not been able to become gainfully employed over the stigma of this termination. The defendant was told by Attorney Larry O Brockman on March 27th 2007 on the first floor of the St. Clair County Courthouse that he had happened to be up there that day and seen what occurred his exact statement was "Yeah I saw her do that, that's not right, they can't do that."

It is the Plaintiffs position that the St Clair County Court Clerk and the St. Clair County Court impeded and denied his basic civil liberties and in so doing created a grievous and potentially dangerous situation for the Plaintiffs minor children and the Plaintiff. That the court denied the Plaintiffs right to counsel and proceeded to make a custody change of the minor children without any best interest determination at all or hearing any testimony to what is in the minor children's best interest and that the denial of counsel by the court to the Plaintiff was so that the law could be circumvented and a change of custody could be made without considering the best interest of the minor children or hearing any evidence.

   In closing the Plaintiff make these very salient and relevant points. The Plaintiff is college educated and has studied many subjects one of which was World Religion. The Defendant is high school educated. The Plaintiff recognizes the difference between devout worship and faith in religion and fanaticism. Throughout this relationship the defendant used a fanatical belief system to justify the complete domination, manipulation and control of the members of this family or to justify whatever bizarre behaviors the Defendant choose to display. The Defendant used this belief system to justify all of her actions as morally superior in what can be referred to as the "holier than thou" syndrome even when her actions endangered the minor children. The Defendant also in talking to her family on how to proceed in this relationship to achieve her goals would have conversations at times in front of the Plaintiff in Spanish and Portuguese not realizing that the Plaintiff could understand enough to get that the Defendant had help in planning and executing her actions from her family members. In knowing this as a safeguard and protection measure for the minor children the Plaintiff can produce the homes phone records going back to early 2002.

   That since March 1st 2007, The Defendant has again begun to alienate the minor children form the Plaintiff and the minor children's older brother by again outright denying phone contact, limiting phone contact or telling the minor children what to and what not to say despite a court order in place allowing phone contact. That again the Plaintiff has had to call the Walnut Creek Police department on 3 separate occasions,

each with an incident number, in an effort to get the Defendant to abide by this courts orders and each time The Plaintiff has been told there is nothing Walnut Creek can do to enforce this courts orders, St. Clair County has jurisdiction. Specifically phone contact has been denied on 03/13/07, 03/14/07/, 03/16/07,
03/17/07, 03/18/07, 03/22/07, 03/23/07, 03/27/07, 03/30/07, 04/01/07, 04/03/07, 04/04/07, 04/08/07, 04/14/07, and finally on 04/15/07 The Defendant has denied contact.

The bottom line is, that despite all of this, the Plaintiff is the on who has demonstrated that he is best able to facilitate a close relationship of the minor children to both parents and has done so. The Plaintiff feels that it is the best interest of the minor children to be allowed to have the benefit of the love and guidance of a full relationship with both biological parents and has strived to accomplish this. The Defendant thru both actions and words has done exactly the opposite not only depriving the minor children of the benefit of the love and guidance of both biological parents but removed the bond of the minor children with their older sibling and removed the bond of the minor children with their paternal grandparents all to go live with a sister which is the only family she has in the US. The Defendant has no extended family, no ties to her community, owns no real estate and basically has nothing to keep her here in the US. The Plaintiff does.

**Wherefore,** Plaintiff, Charles T. Paclik, respectfully requests that this court enter an order granting this Petition For relief and remanding this case to the Federal Courts. Appoint appropriate experienced legal counsel for the Plaintiff. Seal this record as long as the US Citizen minor children are in the possession of the Peruvian National Defendant. Issue an order considering the Defendant a flight risk and that any and all visitation must be supervised by an Officer of The Court. Vacate all Orders previously enterd by the St. Clair County Court. Reinstate the Plenary Order Of Protection. Award full legal and physical custody of the US Citizen minor children to The US Citizen Plaintiff. Issue a restraining order against Brenda Yaeger, Brenda Yaegers sister, Henry Goehner and Nikki Clay. Enter an order that the Defendant violated the Federal Wiretapping Statutes. Enter an Order for an annulment of the Matrimonial bonds based on Immigration marriage fraud. Enter an order to investigate the practices of the St Clair County Court and Enter an Order holding the Defendant and St. Clair County responsible for all Attorneys fees and any and all costs associated with litigating this case since September 2005 and for full restitution of the lost wages and mental anguish suffered by the Plaintiff and for such other and further relief as this court deems just and proper under the circumstances.

Charles T. Paclik<br>
623 St. Clair Ave. Belleville, IL 62220<br>
Telephone: (618) 789-1566

### Verification of Certification
    Under penalties as provided by law pursuant to Section 1-109 of the code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Charles T. Paclik

### CERTIFICATE OF SERVICE

The Undersigned certifies that a copy of the foregoing instrument was served upon the following attorneys of record by enclosing the same in an envelope addressed to such attorneys at their business address as shown below, with postage fully prepaid, and by depositing said envelope in a United States Post Office mailbox in Belleville, Illinois, on this     day of             , 2007, such attorneys being as follows:

Ms. E. Nicole Carrion  
Thomas, Mottaz, and Eastman  
2520 State Street  
Suite 398  
Alton, IL. 62002  

Ms. Patricia Kievlan  
Pessin, Baird & Wells  
105 North Illinois Street  
P.O. Box L  
Belleville, IL. 62222-1314  

Charles T. Paclik